UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ZOILO JUAN LOPEZ MARTINEZ,

      Plaintiff,

v.                             CASE NO. 3:21-cv-943-MMH-MCR

ACTING COMMISSIONER OF
THE SOCIAL SECURITY
ADMINISTRATION,

      Defendant.

_____/

## REPORT AND RECOMMENDATION[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision regarding his application for a period of disability and disability insurance benefits ("DIB").  Following an administrative hearing held on May 13, 2021, the assigned Administrative Law Judge ("ALJ") issued a decision, finding Plaintiff not disabled from August 31, 2018, the alleged disability onset date, through June 2, 2021, the date of the ALJ's

---

[1] "Within 14 days after being served with a copy of [this Report and Recommendation], a party may serve and file specific written objections to the proposed findings and recommendations."  Fed.R.Civ.P. 72(b)(2).  "A party may respond to another party's objections within 14 days after being served with a copy." *Id.*  A party's failure to serve and file specific objections to the proposed findings and recommendations alters the scope of review by the District Judge and the United States Court of Appeals for the Eleventh Circuit, including waiver of the right to challenge anything to which no specific objection was made.  *See* Fed.R.Civ.P. 72(b)(3); 28 U.S.C. § 636(b)(1)(B); 11th Cir. R. 3-1.

decision.[2]  (Tr. 16-78, 215.)  Based on a review of the record, the briefs, and the applicable law, the undersigned recommends that the Commissioner's decision be **AFFIRMED**.

## I.     Standard of Review

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971).  "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004).  Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the

---

[2] Plaintiff had to establish disability on or before December 31, 2023, his date last insured, in order to be entitled to a period of disability and DIB.  (Tr. 16.)

decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.    Discussion

### A.    Issues on Appeal

Plaintiff raises two issues on appeal.  First, he argues that the ALJ's Residual Functional Capacity ("RFC") assessment is not supported by substantial evidence because the ALJ failed to evaluate the prior administrative medical findings of Donald Morford, M.D. and Lily Rocha, M.D. by using the factors of supportability and consistency.  (Doc. 23 at 14, 17-18.)  According to Plaintiff, "the ALJ merely offers a conclusory statement that he found these prior administrative medical findings to be persuasive with regard to the limitation to light work, and offers no further explanation contrary to the requirements of the regulations." (*Id.* at 18.)

Second, Plaintiff argues that the ALJ's consideration of Plaintiff's subjective complaints was insufficient.  (*Id.*)  Plaintiff points out that the ALJ used boiler-plate type language and did "not offer accurate and specific reasons for undermining [his] testimony." (*Id.* at 20.)  Plaintiff explains:

> In the instant case, the ALJ did include a discussion of the
> medical records and claimant's testimony in the decision.
> (Transcript 16-44).  However, this is not enough.  The ALJ must

articulate his reasons in discounting . . . the claimant's testimony. . . .

One thing that must be noted in regards to the ALJ's analysis of the claimant's credibility is apparent cherry picking of the evidence. For instance, when discussing the claimant's problems with his right shoulder with rotator cuff tendinitis and impingement, the ALJ indicates that the claimant has a full range of motion in the lower extremities from November 2018 through January 2020. (Transcript 39). It is not clear how a person's lower extremities has anything to do with limitations in upper extremity. Additionally, it must be noted that the claimant's shoulder pain did not begin until February 19, 2020 when he presented at the office of Dr. Hatch for treatment of the right shoulder. (Tr. 3384.) Accordingly, it's not clear why the ALJ would use records before February 2020 to determine the claimant was not credible regarding his right shoulder complaints.

The ALJ does the same thing in regards to the claimant's complaints regarding his right knee. In this regard, the ALJ refers to the claimant's primary care physician's (Dr. Long) examinations from November 2018 through 2021 to discredit the claimant's complaints regarding his knee. (Transcript 40). However, the claimant's knee condition did not begin until around March 2021 when he sustained an injury from a fall. (T[r]. 3503).

Also, the ALJ seems to infer that the claimant had significant improvement in his symptoms following several injections by Dr. Sharma. (T[r]. 38-39). Although it is accurate that the claimant indicated he experienced a 60% relief of symptoms in March 2019 as noted by the ALJ, the ALJ fails to note that the claimant continued to complain of significant pain throughout the treatment: pain at a level 4 in April 2019; pain at a level 6 in October 2019; pain at a level 6 in May 2020; pain at a level 8 [i]n June 2020; pain at a level 4 in July 2020; pain at a level 6 in January 2021; and pain [at] a level 5 in March 2021. (T[r]. 3207, 3211, 3289, 3292, 3394, 3475, 3489.)

(*Id.* at 21-23.) Plaintiff also argues that the ALJ erred in finding that his

4

minimal activities of daily living were inconsistent with the preclusion of all work activity. (*Id.* at 24.)

Defendant responds that "the ALJ properly articulated his consideration of the prior administrative medical findings, including the supportability and consistency factors." (Doc. 24 at 1.) Defendant states that the ALJ meets the articulation requirement if the evaluation addresses the substance of the factors, which the ALJ did in this case. (*Id.* at 7-8 (citations omitted).)

Defendant also argues that the ALJ properly considered Plaintiff's subjective complaints and his assessment was supported by substantial evidence. (*Id.* at 1, 9.) According to Defendant, "the ALJ's decision sets out in detail the evidence on which the ALJ relied, and the ALJ explicitly identifies the points that led to his finding that Plaintiff's subjective complaints were not entirely consistent with the record." (*Id.* at 12.) Specifically:

> The ALJ considered treatment records reflecting that Plaintiff had a normal range of motion in his back with no tenderness and that examining doctors consistently found normal grip strength. The ALJ also considered that Plaintiff sought work after the alleged onset date, and that he had a broad range of daily activities, which according to his treatment notes included doing yard work, walking twenty minutes a day 3-4 days a week, and going on a vacation to the beach.

(*Id.* at 1-2.)

5

With respect to Plaintiff's "cherry picking" argument, Defendant

explains:

> [I]t can hardly be deemed "cherry picking" for an ALJ to consider
> the medical evidence from the entire period for which a claimant
> seeks benefits. . . . Plaintiff does not dispute that this was an
> accurate assessment of his condition, or that he neither sought
> additional treatment nor complained about his right shoulder
> condition again after [the November 2020] appointment . . . .
>
> . . . As with Plaintiff's right shoulder, the ALJ proceeds to
> discuss the evidence from after March 2021, including that he
> received knee surgery, and was noted to [sic] by Dr. Long to be
> doing well with controlled pain (Tr. 40, 3498). The ALJ explicitly
> included limitations in the RFC to account for Plaintiff's right
> knee osteoarthritis and meniscal tear . . . . Plaintiff does not
> identify what additional limitations he believes his right knee
> impairment required.

(*Id.* at 13-15 (footnote omitted).)

Further, Defendant points out that although the ALJ did not have to

mention every piece of evidence in his decision, he "*did* cite Plaintiff's pain

scale every time he cited Plaintiff's self-reported percentage of improvement."

(*Id.* at 15 (emphasis in original).) Finally, Defendant argues that the ALJ did

not err in considering Plaintiff's daily activities. (*Id.* at 16.) Defendant

states:

> Plaintiff omits two of his most telling activities from his
> argument . . . . First, Plaintiff reported to Mary Gerber, LCSW,
> that he was doing light outside yard work, walked twenty
> minutes a day 3-4 days a week, and went on a vacation to the
> beach, during the same month he testified at his hearing that he
> did nothing in the yard at all (Tr. 42, 60, 3358). Second, he
> testified at the hearing that he had looked for work after his

alleged onset date, most recently in 2019 (Tr. 42, 57-58).  The fact
that Plaintiff looked for work after his alleged onset date provides
additional evidence that his condition was not as limiting as he
alleged.

(*Id.*)

## B.     Standard for Evaluating Opinion Evidence and Subjective Symptoms

The ALJ is required to consider all the evidence in the record when

making a disability determination.  *See* 20 C.F.R. § 404.1520(a)(3).  With

regard to medical opinions, the rules in 20 C.F.R. § 404.1520c apply to claims

filed on or after March 27, 2017.[3]  *See* Revisions to Rules Regarding the

Evaluation of Medical Evidence, 82 F.R. 5844-01, 2017 WL 168819 (Jan. 18,

2017).  Because Plaintiff's claim was filed after March 27, 2017, the Court

applies the revised rules and regulations in effect at the time of the ALJ's

decision.

Under the revised rules and regulations, the ALJ need "not defer or

give any specific evidentiary weight, including controlling weight, to any

medical opinion(s) . . . , including those from [the claimant's] medical

sources."  20 C.F.R. § 404.1520c(a).  The ALJ will articulate in the

administrative decision how persuasive all of the medical opinions are in the

case record, 20 C.F.R. § 404.1520c(b), but need not articulate how evidence

---

[3] The rules in 20 C.F.R. § 404.1527 apply to claims filed before March 27,
2017.

from non-medical sources has been considered, 20 C.F.R. § 404.1520c(d).

"When a medical source provides one or more medical opinions," those opinions will be considered "together in a single analysis," using the factors listed in 20 C.F.R. §§ 404.1520c(c)(1) through (c)(5), as appropriate.  20 C.F.R. §§ 404.1520c(a), (b)(1).  The ALJ is "not required to articulate how [he/she] considered each medical opinion . . . from one medical source individually." 20 C.F.R. § 404.1520c(b)(1).

When evaluating the persuasiveness of medical opinions, the most important factors are supportability[4] and consistency.[5]  20 C.F.R. §§ 404.1520c(a), (b)(2).  Thus, the ALJ "will explain how [he/she] considered the supportability and consistency factors for a medical source's medical opinions" in the determination or decision but is not required to explain how he/she considered the rest of the factors listed in 20 C.F.R. § 404.1520c(c).  20 C.F.R. § 404.1520c(b)(2).  As explained recently by another court in this District:

> Overall, supportability relates to the extent to which a medical
> source has articulated support for the medical source's own

---

[4] "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions  . . . will be."  20 C.F.R. § 404.1520c(c)(1).

[5] "The more consistent a medical opinion(s)  . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s)  . . . will be."  20 C.F.R. § 404.1520c(c)(2).

opinion, while consistency relates to the relationship between a
medical source's opinion and other evidence within the record.  In
other words, the ALJ's analysis is directed to whether the
medical source's opinion is *supported* by the source's own records
and *consistent* with the other evidence of record—familiar
concepts within the framework of social security litigation.

*Cook v. Comm'r of Soc. Sec.*, No. 6:20-cv-1197-RBD-DCI, 2021 WL 1565832,

*3 (M.D. Fla. Apr. 6, 2021) (emphasis in original) (report and

recommendation adopted by 2021 WL 1565162 (M.D. Fla. Apr. 21, 2021)).

When "two or more medical opinions . . . about the same issue are both

equally well-supported . . . and consistent with the record . . . but are not

exactly the same," the ALJ will articulate how he/she considered the other

most persuasive factors listed in 20 C.F.R. §§ 404.1520c(c)(3) through (c)(5),

which include a medical source's relationship with the claimant,[6]

specialization, and other factors.[7]  20 C.F.R. § 404.1520c(b)(3).

When a claimant seeks to establish disability through his own

testimony of pain or other subjective symptoms, the Eleventh Circuit's three-

---

[6] The relationship with the claimant factor combines consideration of the
following issues: the length of the treatment relationship, the frequency of the
examinations, the purpose of the treatment relationship, the extent of the
treatment relationship, and the examining relationship.  20 C.F.R. §
404.1520c(c)(3)(i)-(v).

[7] The other factors may include: the medical source's familiarity with the
other evidence in the claim; the medical source's understanding of the disability
program's policies and evidentiary requirements; and the availability of new
evidence that may render a previously issued medical opinion more or less
persuasive.  20 C.F.R. § 404.1520c(c)(5).

part "pain standard" applies. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir.
1991) (per curiam). "If the ALJ decides not to credit such testimony, he [or
she] must articulate explicit and adequate reasons for doing so." *Id.*

> The pain standard requires (1) evidence of an underlying
> medical condition and either (2) objective medical evidence that
> confirms the severity of the alleged pain arising from that
> condition or (3) that the objectively determined medical condition
> is of such a severity that it can be reasonably expected to give
> rise to the alleged pain.

*Id.*

Once a claimant establishes that his subjective symptom is disabling
through "objective medical evidence from an acceptable medical source that
shows . . . a medical impairment(s) which could reasonably be expected to
produce the pain or other symptoms," pursuant to 20 C.F.R. § 404.1529(a),
"all evidence about the intensity, persistence, and functionally limiting effects
of pain or other symptoms must be considered in addition to the medical
signs and laboratory findings in deciding the issue of disability," *Foote*, 67
F.3d at 1561. *See also* SSR 16-3p[8] (stating that after the ALJ finds a
medically determinable impairment exists, the ALJ must analyze "the
intensity, persistence, and limiting effects of the individual's symptoms" to

---

[8] SSR 16-3p rescinded and superseded SSR 96-7p, effective March 28, 2016,
eliminating the use of the term "credibility," and clarifying that "subjective
symptom evaluation is not an examination of an individual's character." SSR 16-3p.

determine "the extent to which an individual's symptoms limit his or her ability to perform work-related activities").

As stated in SSR 16-3p:

> In considering the intensity, persistence, and limiting effects of an individual's symptoms, [the ALJ must] examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.
>
> . . .
>
> In evaluating an individual's symptoms, it is not sufficient for our adjudicators to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough for our adjudicators simply to recite the factors described in the regulations for evaluating symptoms.[9] The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.
>
> . . .
>
> In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should

---

[9] These factors include: (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the claimant's pain or other symptoms; (5) any treatment, other than medication, received by the claimant to relieve the pain or other symptoms; (6) any measures (other than treatment) used to relieve the pain or other symptoms (*e.g.*, lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 16-3p.

not be to determine whether he or she is a truthful person.
Rather, our adjudicators will focus on whether the evidence
establishes a medically determinable impairment that could
reasonably be expected to produce the individual's symptoms and
given the adjudicator's evaluation of the individual's symptoms,
whether the intensity and persistence of the symptoms limit the
individual's ability to perform work-related activities[.]

SSR 16-3p.

"[A]n individual's attempts to seek medical treatment for symptoms

and to follow treatment once it is prescribed" will also be considered "when

evaluating whether symptom intensity and persistence affect the ability to

perform work-related activities." *Id.* "[I]f the frequency or extent of the

treatment sought by an individual is not comparable with the degree of the

individual's subjective complaints, or if the individual fails to follow

prescribed treatment that might improve symptoms, [the adjudicator] may

find the alleged intensity and persistence of an individual's symptoms are

inconsistent with the overall evidence of record." *Id.* However, the

adjudicator "will not find an individual's symptoms inconsistent with the

evidence in the record on this basis without considering possible reasons he

or she may not comply with treatment or seek treatment consistent with the

degree of his or her complaints." *Id.* In considering an individual's treatment

history, the adjudicator may consider, *inter alia*, one or more of the following:

- That the individual may have structured his or her activities
  to minimize symptoms to a tolerable level by avoiding physical
  activities or mental stressors that aggravate his or her

symptoms;
- That the individual may receive periodic treatment or evaluation for refills of medications because his or her symptoms have reached a plateau;
- That the individual may not agree to take prescription medications because the side effects are less tolerable than the symptoms;
- That the individual may not be able to afford treatment and may not have access to free or low-cost medical services;
- That a medical source may have advised the individual that there is no further effective treatment to prescribe or recommend that would benefit the individual;
- That due to various limitations (such as language or mental limitations), the individual may not understand the appropriate treatment for or the need for consistent treatment.

*Id.*

## C.   Relevant Evidence of Record

### 1.   Imaging Studies

On February 8, 2018, Plaintiff underwent X-rays of his lumbar spine, which were compared to prior lumbar imaging from October 5, 2016, March 13, 2017, and March 28, 2017.  (Tr. 515.)  The February 8, 2018 lumbar X-rays showed:

> Interval removal of posterior fusion hardware.  No acute bony process.
>
> Otherwise, no significant change from multiple recent prior exams with stable L1 to S1 disk spacer placement.  Again seen is slight anterior and left lateral position of the L2-L4 disk spacer compared to the other disk spacer, of unknown clinical significance.

(*Id.*)

On October 11, 2019, Plaintiff underwent X-rays of his left hand due to diffuse pain in his left first digit for two months after a fall. (Tr. 3268.) The impression was: "Mild to moderate degenerative arthropathy involving the first [metacarpophalangeal] and first [interphalangeal] joint." (*Id.*)

On December 13, 2019, Plaintiff underwent an MRI of his lumbar spine without contrast, which indicated:

1. Postsurgical changes of intervertebral body disc space placement at L1-2 to L5-S1 associated with paravertebral soft tissue edema . . . .
2. Disc edema at the level of L3-4 and L4-5[,] which could be related to postsurgical changes. No other supporting finding to suggest discitis/osteomyelitis.
3. Multilevel mild degenerative spondylosis without significant spinal canal or foraminal narrowing[.]

(Tr. 3269-70.)

On March 13, 2020, Plaintiff underwent an MRI of his right shoulder without contrast, which showed the following:

1. There is undersurface tendinopathy of the supraspinatus insertion with bony edema and cystic change of the greater tuberosity.
2. Moderate joint effusion extending into the biceps tendon sheath with a number of loose bodies in the groove.
3. Small tear of the anterior inferior labrum.
4. Marked osteoarthritis of glenohumeral joint with marked spurring and articular cartilage thinning of the glenoid[.]

(Tr. 3381.)

On April 7, 2020, Plaintiff underwent X-rays of both shoulders, which showed arthritic changes and narrowing of the glenohumeral joints and

inferior osteophytes.  (Tr. 3353.)

On March 6, 2021, Plaintiff underwent an MRI of his right knee without contrast.  (Tr. 3511.)  While the MRI report is partially obstructed in the record, the following findings can be discerned:

1. Radial and horizontal tearing of the posterior horn . . . .
2. Chronic-appearing three compartment chondral changes . . . .
3. Extensor tendinosis without tear . . . .
4. Moderate-sized joint effusion with moderate severity synovitis.
5. Small popliteal cyst.

(*Id.*)

## 2.     Dr. Carpenter's Consultative Evaluation

On May 20, 2019, David W. Carpenter, M.D. examined Plaintiff at the request of the Office of Disability Determinations.  (Tr. 3155.)  Dr. Carpenter recorded the following pertinent history:

> The claimant reports a long history of chronic pain and stiffness symptoms affecting his low back.  He reports that he experienced several injuries to his low back while active-duty military and he is status post lumbar spine surgery times [two] in 2016 and 2017. Despite surgical intervention, he continues to experience daily pain and stiffness symptoms at his low back made worse with prolonged sitting, standing, ambulation[,] and activity.  He states that he has been ambulating with the assistance of a cane on occasion since the surgery in 2017, to provide both pain relief and stability.  He did bring a cane with him today.  He remains capable of driving and performing activities of daily living without assistance.

(*Id.*)

Dr. Carpenter observed that Plaintiff was able to get on and off the

examining table without difficulty or assistance.  (Tr. 3156.)  His physical examination was generally unremarkable except for a positive straight leg raising test "on the left in a seated position producing discomfort in the low back and gluteus regions."  (Tr. 3156-57.)  Plaintiff was able to ambulate "without the use of a cane or assistive device" and walk "in a heel-to-toe fashion without a significant limp."  (Tr. 3157.)  His pulses in both lower extremities were +2/4 and his deep tendon reflexes were "1+ at the elbows and absent at the knees bilaterally."  (*Id.*)  The range of motion report form indicated normal motion, except in the lumbar spine where it was reduced with forward flexion, extension, and lateral flexion.  (Tr. 3159.) Dr. Carpenter diagnosed Plaintiff with, *inter alia*, chronic low back pain and stiffness, status post-surgery times two.  (Tr. 3158.)

### 3.  State Agency Non-Examining Consultants

On August 27, 2019, after reviewing the records available as of that date, Dr. Morford completed a Physical RFC Assessment of Plaintiff's functional abilities.  (Tr. 87-90.)  Dr. Morford opined, *inter alia*, that Plaintiff could lift and/or carry 20 pounds occasionally and ten pounds frequently; could stand and/or walk for about six hours and sit for about six hours in an eight-hour workday; could frequently balance and climb ramps/stairs; could occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, and scaffolds; and should avoid concentrated exposure to extreme cold/heat, noise,

16

vibration, hazards, fumes, odors, dusts, gases, etc.  (Tr. 88-89.)

On November 13, 2019, at the reconsideration level, Dr. Rocha re-affirmed Dr. Morford's Physical RFC Assessment, noting no worsening in Plaintiff's condition.  (Tr. 102-05.)  She noted that Plaintiff did not use an assistive device during the initial encounter with the Social Security Administration in January of 2019 and as reported by the consultative examiner.  (Tr. 105.)

### D.    The ALJ's Decision

At step two of the sequential evaluation process,[10] the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, degenerative joint disease of the right shoulder with rotator cuff tendonitis and impingement, osteoarthritis and medial meniscal tears of the right knee, hyperglycemia, hypertension, obstructive sleep apnea ("OSA"), obesity, bilateral hearing loss, and tinnitus.  (Tr. 18.)  At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 23.)

Then, before proceeding to step four, the ALJ determined that Plaintiff

---

[10] The Commissioner employs a five-step process in determining disability. *See* 20 C.F.R. § 404.1520(a)(4).

had the RFC to perform a reduced range of light work, as follows:

> [H]e needs to avoid ladders or unprotected heights; [he] needs to
> avoid the operation of heavy, moving machinery; [he] needs to
> avoid concentrated dust, fumes, or gases; [he can] occasionally
> bend, crouch, kneel, or stoop, but needs to avoid squatting or
> crawling; [he] needs to avoid the push/pull of arm controls; [he]
> needs to avoid the operation of foot controls; [he] needs a
> monocane for ambulation; [he] needs to avoid a high noise
> environment; and [he] needs to avoid extreme heat.

(Tr. 24.)

In making these findings, the ALJ discussed Plaintiff's complaints, the

medical evidence, and the medical opinions and prior administrative medical

findings.  (Tr. 24-44.)  The ALJ found that while Plaintiff's medically

determinable impairments could reasonably be expected to cause the alleged

symptoms, his statements concerning the intensity, persistence, and limiting

effects of those symptoms were "not entirely consistent with the medical

evidence and other evidence in the record."  (Tr. 38.)  The ALJ explained that

"the medical evidence of record during the period at issue [was] not consistent

with the claimant's allegations of disabling levels of back pain."  (*Id.*)  In

support, the ALJ cited to Dr. Adrian Long's examinations for the period of

November 2018 through April 2021; Dr. Kavita Sharma's examinations for

the period of December 2018 through March 2021; and Dr. Carpenter's May

2019 consultative examination findings.  (*Id.*)  The ALJ added that "[i]maging

during the period at issue [was] also inconsistent with disabling functional

limitations." (*Id.*)  In support, the ALJ cited to the lumbar MRI findings from

December 13, 2019.  (*Id.*)  The ALJ also cited to Plaintiff's treatment regimen

and the reported improvement of his symptoms.  (Tr. 38-39.)  The ALJ

further noted that Plaintiff reportedly used his cane only "on occasion" and

was not always compliant with treatment.  (Tr. 39.)

With citations to relevant records, including records from Dr. Long, Dr.

Robert Hatch, Dr. Albert Volk, and Dr. Carpenter, the ALJ explained how he

accounted for Plaintiff's limitations from degenerative disc disease of the

lumbar spine, degenerative joint disease of the right shoulder, and

osteoarthritis of the right knee with meniscal tears.  (Tr. 39-41.)  The ALJ

stated that he had accounted for Plaintiff's degenerative disc disease of the

lumbar spine by limiting Plaintiff to light work, "except he need[ed] to avoid

the operation of heavy, moving machinery; [could] occasionally bend, crouch,

kneel, or stoop, but need[ed] to avoid squatting or crawling; need[ed] to avoid

the operation of foot controls; and need[ed] a monocane for ambulation."  (Tr.

39.)  The ALJ then stated:

> There is no evidence of further treatment or complaints related to
> the claimant's right shoulder after [the November 12, 2020] visit.
> The claimant's allegations of difficulties with gripping and
> grasping objects because of his history of surgery on both
> shoulders, which has caused numbness in his hands, is not
> consistent with these objective findings and treatment history.
> They are also inconsistent with the lack of complaints and
> abnormal findings related to the left shoulder during the period
> at issue and with his reports to his orthopedist that he did well

following his left shoulder surgery in 2013.  Finally, they are not consistent with his testimony that he is able to drive and use a computer/smartphone/tablet for Facebook, to go on the internet, for email, and for online banking, which require greater fine and gross manipulation abilities than he has alleged.  The [ALJ] has accounted for the claimant's degenerative joint disease of the right shoulder with rotator cuff tendonitis and impingement by limiting him to light work as defined in 20 CFR 404.1567(b) except he needs to avoid ladders or unprotected heights; needs to avoid the operation of heavy, moving machinery; needs to avoid crawling; and needs to avoid the push/pull of arm controls.

(Tr. 40.)  Further, the ALJ stated that he had accounted for Plaintiff's osteoarthritis of the right knee with meniscal tears by limiting Plaintiff to light work, "except he need[ed] to avoid ladders or unprotected heights; need[ed] to avoid the operation of heavy, moving machinery; [could] occasionally bend, crouch, kneel, or stoop, but need[ed] to avoid squatting or crawling; need[ed] to avoid the operation of foot controls; and need[ed] a monocane for ambulation."  (Tr. 41.)

Additionally, the ALJ found that Plaintiff had "reported activities and abilities that [were not] consistent with a preclusion of all work activity."  (Tr. 42.)  The ALJ explained:

For example, at the hearing, the claimant testified that he has looked for work since his alleged onset date, most recently in 2019.  He also testified that he is able to wash[] a couple of dishes, fold[] some clothes, prepare simple meals, shop for groceries independently once a week, walk[] outside with his wife as much as he can, and use a computer/smartphone/tablet for Facebook, to go on the internet, for email, and for online banking. In May 2019, the claimant told Dr. Carpenter that he remained capable of driving and performing activities of daily living

20

without assistance (Exhibit 7F).  In May 2020, the claimant told
LCSW Gerber that he had been doing light outside yard work,
walking for 20 minutes per day, 3-4 days per week, and spending
time at the beach with his wife.  This contemporaneous report to
LCSW Gerber is inconsistent with his testimony that he does no
work in the yard.

(Tr. 42-43.)

The ALJ then addressed the medical opinions and prior administrative

medical findings, stating that he could not defer or give any specific

evidentiary weight, including controlling weight, to any of them.  (Tr. 43.)

The ALJ specifically addressed the administrative medical findings of Dr.

Morford and Dr. Rocha, as follows:

The [ALJ] finds these opinions persuasive with regard to the
limitation to light work; however, additional non-exertional
limitations are warranted based on subsequently submitted
evidence.  Limitations to no climbing of ladders, work at
unprotected heights, squatting, or crawling are warranted based
on the claimant's degenerative joint disease of the right shoulder
and his osteoarthritis and meniscal tear of the right knee, both of
which are status-post surgical intervention.  These impairments,
along with the claimant's need for injective therapy for
degenerative disc disease of the lumbar spine, also warrant
including the following limitations: needs to avoid the push/pull
of arm controls; needs to avoid the operation of foot controls; and
needs a monocane for ambulation.  The record does not support a
limitation with regard to climbing of stairs, as the claimant's
lower extremity examinations typically showed normal strength.
A limitation with regard to balancing is not warranted based on
Dr. Carpenter's findings that the claimant ambulated in a heel-
to-toe fashion without a significant limp; was upright when
ambulating and was capable of safely ambulating in the
examination room without the use of a cane or assistive device;
and got on and off the examination table without difficulty or
assistance (Exhibit 7F).  There is also no evidence to support a

21

limitation with regard to working in environments of extreme
cold or vibration.

(*Id.*)  The ALJ concluded that his RFC assessment was "supported by the
objective medical findings on examination, the efficacy of the claimant's
treatment regimen, the claimant's noncompliance with physical therapy, and
his activities of daily living."  (Tr. 44.)

Then, at step four, the ALJ determined that Plaintiff was capable of
performing his past relevant work of Administrative Officer, [11] DOT No.
169.167-010, as generally performed and as actually performed but only
during the times that it was performed at the light exertional level.  (*Id.*)
Therefore, the ALJ concluded that Plaintiff was not disabled from August 31,
2018 through June 2, 2021.  (Tr. 44-45.)

### E.    Analysis

The Court finds that the ALJ's decision is based on correct legal
standards and is supported by substantial evidence in the record.  The ALJ
properly articulated his consideration of the prior administrative medical
findings, including the supportability and consistency factors set forth in 20
C.F.R. §§ 404.1520c(c)(1) & (c)(2).  "While the ALJ may not have used the

---

[11] The Administrative Officer job is sedentary according to the Dictionary of
Occupational Titles ("DOT"), but Plaintiff performed it at the light to medium
exertional level.  (Tr. 44.)

words 'supportability' and 'consistency,' the ALJ's discussion of [Dr. Morford and Dr. Rocha's] opinions and findings regarding the record was based on those factors." *Cook*, 2021 WL 1565832 at \*5; *see also Thaxton v. Kijakazi*, No. 1:20-cv-616-SRW, 2022 WL 983156, \*8 (M.D. Ala. Mar. 30, 2022) (stating that "the ALJ need not use any magic words in discussing whether a medical opinion is supported by evidence from the medical source himself and whether the opinion is consistent with other evidence of record"); *cf. Cueva v. Kijakazi*, No. 1:20-cv-407, 2021 WL 4192872, \*5 (E.D. Cal. Sept. 15, 2021) ("An ALJ need not recite any magic words to reject a physician's opinion where the record reveals specific, legitimate inferences that may be drawn from the ALJ's opinion justifying the decision not to adopt a physician's opinion.").

Here, after setting forth the specific medical findings by Dr. Morford and Dr. Rocha, the ALJ explained how their opinions were considered in the decision:

> The [ALJ] finds these opinions persuasive with regard to the limitation to light work; however, additional non-exertional limitations are warranted based on subsequently submitted evidence. Limitations to no climbing of ladders, work at unprotected heights, squatting, or crawling are warranted based on the claimant's degenerative joint disease of the right shoulder and his osteoarthritis and meniscal tear of the right knee, both of which are status-post surgical intervention. These impairments, along with the claimant's need for injective therapy for degenerative disc disease of the lumbar spine, also warrant including the following limitations: needs to avoid the push/pull

of arm controls; needs to avoid the operation of foot controls; and needs a monocane for ambulation. The record does not support a limitation with regard to climbing of stairs, as the claimant's lower extremity examinations typically showed normal strength. A limitation with regard to balancing is not warranted based on Dr. Carpenter's findings that the claimant ambulated in a heel-to-toe fashion without a significant limp; was upright when ambulating and was capable of safely ambulating in the examination room without the use of a cane or assistive device; and got on and off the examination table without difficulty or assistance (Exhibit 7F). There is also no evidence to support a limitation with regard to working in environments of extreme cold or vibration.

(Tr. 43.)

Moreover, the ALJ's reasons for either assigning additional limitations to Plaintiff or removing certain limitations from the State agency doctors' assessments when formulating Plaintiff's RFC are supported by substantial evidence. The ALJ limited Plaintiff to "no climbing of ladders, work at unprotected heights, squatting, or crawling" based on Plaintiff's "degenerative joint disease of the right shoulder and his osteoarthritis and meniscal tear of the right knee, both of which [were] status-post surgical intervention." (Id.) Based on these impairments and Plaintiff's need for injective therapy for degenerative disc disease of the lumbar spine, the ALJ included the following additional limitations in Plaintiff's RFC: the need to avoid push/pull of arm controls; the need to avoid operation of foot controls; and the need for a monocane for ambulation. (Id.) On the other hand, the ALJ removed the following limitations, which were present in the State

agency doctors' assessments: (1) the limitation with regard to climbing stairs because Plaintiff's "lower extremity examinations typically showed normal strength"; (2) the limitation with regard to balancing because Dr. Carpenter noted that Plaintiff ambulated in a heel-to-toe fashion without a significant limp, was upright when ambulating, was capable of ambulating safely in the examination room without the use of a cane or assistive device, and was able to get on and off the examination table without difficulty or assistance; and (3) the limitation with regard to working in environments of extreme cold or vibration based on lack of evidence to support such limitation. (*Id.*) The ALJ's above-stated findings are supported by substantial evidence in the record. (*See* Tr. 347, 350, 355, 3156-57, 3179, 3184, 3187, 3191, 3195, 3198, 3201, 3205, 3228, 3232, 3236, 3239, 3243, 3247, 3250, 3253, 3257.)

In addition, the ALJ's extensive discussion of the evidence as part of his RFC determination and elsewhere in the decision further supports his evaluation of Dr. Morford and Dr. Rocha's administrative medical findings (*see* Tr. 24-44). *See Thaxton*, 2022 WL 983156 at *8 ("An ALJ may refer to evidence discussed elsewhere in the decision when evaluating medical opinions or prior administrative medical findings."). Based on the foregoing, the undersigned recommends that the ALJ's consideration of Dr. Morford and Dr. Rocha's administrative medical findings was supported by substantial evidence and "comported with the requirements of the new Social Security

25

Regulations because the ALJ articulated the evidence affecting the supportability and consistency of the opinion[s]." *Cook*, 2021 WL 1565832 at *5.

The undersigned also recommends that the ALJ's consideration of Plaintiff's subjective complaints was adequate and supported by substantial evidence. The ALJ found that while Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of those symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 38.) The ALJ explained that "the medical evidence of record during the period at issue [was] not consistent with the claimant's allegations of disabling levels of back pain." (*Id.*) In support, the ALJ cited to Dr. Long's examinations for the period of November 2018 through April 2021; Dr. Sharma's examinations for the period of December 2018 through March 2021; and Dr. Carpenter's May 2019 consultative examination findings. (*Id.*) The ALJ added that "[i]maging during the period at issue [was] also inconsistent with disabling functional limitations." (*Id.*) In support, the ALJ cited to the lumbar MRI findings from December 13, 2019. (*Id.*) The ALJ also cited to Plaintiff's treatment regimen and the reported improvement in his symptoms. (Tr. 38-39.) The ALJ further noted that Plaintiff reportedly used his cane only "on occasion" and was not always

26

compliant with treatment.  (Tr. 39.)

With citations to relevant records, including records from Dr. Long, Dr. Hatch, Dr. Volk, and Dr. Carpenter, the ALJ explained how he accounted for Plaintiff's limitations from degenerative disc disease of the lumbar spine, degenerative joint disease of the right shoulder, and osteoarthritis of the right knee with meniscal tears.  (Tr. 39-41.)  The ALJ stated that he had accounted for Plaintiff's degenerative disc disease of the lumbar spine by limiting Plaintiff to light work, except Plaintiff needed "to avoid the operation of heavy, moving machinery; [could] occasionally bend, crouch, kneel, or stoop, but need[ed] to avoid squatting or crawling; need[ed] to avoid the operation of foot controls; and need[ed] a monocane for ambulation."  (Tr. 39.)  The ALJ then stated:

> There is no evidence of further treatment or complaints related to the claimant's right shoulder after [the November 12, 2020] visit. The claimant's allegations of difficulties with gripping and grasping objects because of his history of surgery on both shoulders, which has caused numbness in his hands, is not consistent with these objective findings and treatment history. They are also inconsistent with the lack of complaints and abnormal findings related to the left shoulder during the period at issue and with his reports to his orthopedist that he did well following his left shoulder surgery in 2013.  Finally, they are not consistent with his testimony that he is able to drive and use a computer/smartphone/tablet for Facebook, to go on the internet, for email, and for online banking, which require greater fine and gross manipulation abilities than he has alleged.  The [ALJ] has accounted for the claimant's degenerative joint disease of the right shoulder with rotator cuff tendonitis and impingement by limiting him to light work as defined in 20 CFR 404.1567(b)

except he needs to avoid ladders or unprotected heights; needs to
avoid the operation of heavy, moving machinery; needs to avoid
crawling; and needs to avoid the push/pull of arm controls.

(Tr. 40.)  Further, the ALJ stated that he accounted for Plaintiff's

osteoarthritis of the right knee with meniscal tears by limiting Plaintiff to

light work, except he needed "to avoid ladders or unprotected heights;

need[ed] to avoid the operation of heavy, moving machinery; [could]

occasionally bend, crouch, kneel, or stoop, but need[ed] to avoid squatting or

crawling; need[ed] to avoid the operation of foot controls; and need[ed] a

monocane for ambulation."  (Tr. 41.)

Additionally, the ALJ found that Plaintiff had "reported activities and

abilities that [were not] consistent with a preclusion of all work activity."  (Tr.

42.)  The ALJ explained:

> For example, at the hearing, the claimant testified that he has
> looked for work since his alleged onset date, most recently in
> 2019.  He also testified that he is able to wash[] a couple of
> dishes, fold[] some clothes, prepare simple meals, shop for
> groceries independently once a week, walk[] outside with his wife
> as much as he can, and use a computer/smartphone/tablet for
> Facebook, to go on the internet, for email, and for online banking.
> In May 2019, the claimant told Dr. Carpenter that he remained
> capable of driving and performing activities of daily living
> without assistance (Exhibit 7F).  In May 2020, the claimant told
> LCSW Gerber that he had been doing light outside yard work,
> walking for 20 minutes per day, 3-4 days per week, and spending
> time at the beach with his wife.  This contemporaneous report to
> LCSW Gerber is inconsistent with his testimony that he does no
> work in the yard.

(Tr. 42-43.)

Contrary to Plaintiff's argument, the ALJ provided explicit and adequate reasons, supported by substantial evidence, for his evaluation of Plaintiff's subjective complaints.  First, as the ALJ noted, the lumbar MRI results from December 13, 2019 indicated some mild abnormalities.  (Tr. 38, 3269-70 (showing, *inter alia*, multilevel, mild degenerative spondylosis without significant spinal canal or foraminal narrowing and some postsurgical changes).)  The rest of the imaging studies from the period at issue also revealed only mild to moderate abnormalities, with the exception of the right shoulder MRI from March 13, 2020, which showed "[m]arked osteoarthritis of glenohumeral joint with marked spurring and articular cartilage thinning of the glenoid."  (Tr. 3381; *see also* Tr. 3268, 3353, 3511.)  The ALJ adequately considered Plaintiff's complaints regarding his right shoulder and noted the lack of complaints and further treatment after November 12, 2020, as well as Plaintiff's daily activities, which required greater fine and gross manipulation abilities than alleged.  (Tr. 40.)

Further, the ALJ correctly noted that there was reported improvement in Plaintiff's symptoms as a result of his treatment regimen.  (*See, e.g.*, Tr. 465 (stating, on April 25, 2018, that Plaintiff's chronic pain and range of motion had improved and he needed less assistance from his wife with dressing on occasion); Tr. 459-60 (stating, on April 26, 2018, that Plaintiff's pain level goes down from 2/10 to 1/10 after acupuncture treatment); Tr. 457-

58 (reporting, on May 2, 2018, a pain level of 2/10 and that Plaintiff would

"continue nonoperative symptomatic treatment of episodic pain and

stiffness"); Tr. 450 (reporting, on May 14, 2018, a pain level of 0/10); Tr. 445

(reporting, on May 23, 2018, a pain level of 2/10 while sitting, and 50% pain

relief and improvement in range of motion after injection therapy); Tr. 364-65

& 375-76 (reporting to Dr. Sharma on January 25, 2019 that Plaintiff had

60% relief after a diagnostic facet joint injection, which reduced his pain level

from 7/10 to 4/10); Tr. 1018 (reporting to Dr. Sharma on February 15, 2019

that Plaintiff's pain level was 4/10 and he had 60% relief post procedure); Tr.

1014 (reporting to Dr. Sharma on March 14, 2019 that Plaintiff's pain level

was 5/10 and he had 60% relief after a therapeutic facet joint injection); Tr.

3214 (reporting to Dr. Sharma on April 2, 2019 that Plaintiff had 50%

improvement post procedure and his pain level was 6/10 pre-procedure); Tr.

3211 (reporting to Dr. Sharma on April 23, 2019 that Plaintiff's pain level

was 4/10 and he experienced 60% relief after lumbar radiofrequency

ablation); Tr. 3207 (reporting to Dr. Sharma on October 2, 2019 that Plaintiff

experienced 75% improvement after lumbar radiofrequency ablation, but his

pain returned to level 6/10); Tr. 3386 (reporting to Dr. Hatch on November

20, 2019 that Plaintiff was "pleased with his progress" as 90% of his pain had

been eliminated, even though discomfort could arise to 3/10 at times); Tr.

3401 (reporting to Dr. Sharma on June 25, 2020 that Plaintiff's pain level

30

was 5/10 and he experienced 90% improvement post-procedure); Tr. 3398 (reporting to Dr. Sharma on July 9, 2020 that Plaintiff experienced 90% improvement post-procedure); Tr. 3394 (reporting to Dr. Sharma on July 30, 2020 that Plaintiff's lower back pain was 4/10 and he experienced 65% improvement post-procedure); Tr. 3432 (reporting on September 8, 2020 that Plaintiff experienced "some significant relief" from injection therapy in the right shoulder with "intermittent discomfort on occasion but significantly less than . . . previously"); Tr. 3431 (reporting on November 12, 2020 that the corticosteroid injection in the right shoulder "helped significantly" and Plaintiff was back for another one due to recurrent pain and discomfort); Tr. 3480 (reporting, on February 26, 2021, that Plaintiff experienced 50% improvement after a left sacroiliac joint injection); Tr. 58 (stating at the May 13, 2021 administrative hearing that Plaintiff's prescription medications really helped); *but see* Tr. 3388 (reporting to Dr. Hatch on November 6, 2019 that Plaintiff's left hand pain was at 7/10 before receiving an injection); Tr. 3384 (noting that Plaintiff's right shoulder pain was at 9/10, but it substantially decreased minutes after the injection on February 19, 2020); Tr. 3289 (noting that Plaintiff's pre-procedure pain was 8/10 on June 2, 2020); Tr. 3475 (reporting, on March 19, 2021, only 20% improvement after bilateral sacroiliac joint injection and complaining of pain in the lower back and both hips).)

31

There is also substantial evidence in the record to support the ALJ's statement that Plaintiff used his cane occasionally.  (*See* Tr. 3155 & 3157 (stating, on May 20, 2019, that Plaintiff "ha[d] been ambulating with the assistance of a cane on occasion since the surgery in 2017, to provide both pain relief and stability," but was "upright when ambulating" that day and was capable of safely ambulating in the exam room without the use of a cane or assistive device, and remained "capable of driving and performing activities of daily living without assistance"); Tr. 3510 (noting on February 10, 2021 that Plaintiff was "[o]ff cane while walking"); *but see* Tr. 64-65 & 3226 (observing that Plaintiff walked with a cane).)

Additionally, the ALJ properly observed that Plaintiff was not compliant with his prescribed physical therapy.  (*See* Tr. 3455 (noting that Plaintiff did not show up for his physical therapy on January 23, 2020); Tr. 3453-54 (noting that Plaintiff did not show up for his physical therapy on January 28, 2020); Tr. 3443 (noting that Plaintiff did not show up for his physical therapy on February 6, 2020); Tr. 3440 (noting, on February 13, 2020, that Plaintiff missed his appointment that day and consistently showed up late to all of his physical therapy appointments); Tr. 3439 (noting, on May 21, 2020, that Plaintiff "self[-]discharged and never returned to [physical therapy]"); *but see* Tr. 3444-45 (noting that Plaintiff had physical therapy on

February 6, 2020[12]).)

Importantly, there is substantial evidence in the record that Plaintiff's examination findings were generally unremarkable or revealed only mild/minimal abnormalities. (*See, e.g.*, Tr. 352 (noting a normal physical examination by Dr. Long on November 29, 2018); Tr. 355 (noting a normal physical examination by Dr. Long on January 8, 2019); Tr. 3191 (noting a normal physical examination by Dr. Long on March 19, 2019); Tr. 3195 (noting a normal physical examination by Dr. Long on April 22, 2019); Tr. 3198 (noting a normal physical examination by Dr. Long on June 20, 2019); Tr. 3201 (noting a normal physical examination by Dr. Long on July 24, 2019); Tr. 3205 (noting a normal physical examination by Dr. Long on September 24, 2019, except for left hand pain); Tr. 3232 (noting a normal physical examination by Dr. Long on December 27, 2019); Tr. 3384 (noting that Plaintiff's physical examination by Dr. Hatch on February 19, 2020 was positive only for an impingement sign and there was a substantial decrease in Plaintiff's right shoulder pain minutes after the injection, which was previously at 9/10); Tr. 3228 (noting a normal physical examination by Dr. Long on March 23, 2020); Tr. 3379 (noting that Plaintiff's examination by Dr.

---

[12] Plaintiff also had physical therapy on, *inter alia*, January 9, 14, 16, and 31, and February 3, 2020. (Tr. 3449-51, 3456, 3458, 3468.) On January 31, 2020, he reported that his back and shoulder had been hurting so bad that he refused to go for his physical therapy the previous week. (Tr. 3451.)

Hatch on March 24, 2020 was unremarkable except for "right shoulder pain with motion in almost every plane"); Tr. 3351 (noting, on April 7, 2020, that Plaintiff's examination by Dr. Volk was unremarkable except as to his right shoulder); Tr. 3277-79 (noting no complaints and a normal physical examination by Dr. Long on May 6, 2020); Tr. 3436 (noting, on July 1, 2020, that Plaintiff was doing "reasonably well" with moderate postoperative pain after his June 18, 2020 right shoulder surgery); Tr. 3415-17 (noting that Plaintiff's physical examination by Dr. Long on August 10, 2020 was normal); Tr. 3435 (noting, on August 14, 2020, that Plaintiff's right shoulder "surgery did not do quite as well" as the other side and his range of motion was moderately limited with pain, but otherwise unremarkable); Tr. 3432 (noting on September 8, 2020 that Plaintiff's examination was generally unremarkable except for mild abnormalities in the shoulder); Tr. 3412-14 (noting that Plaintiff's physical examination by Dr. Long on November 10, 2020 was normal); Tr. 3507-09 (noting, on February 10, 2021, that Plaintiff's overall physical examination was normal despite reports of back pain at 4/10); Tr. 3503-05 (noting, on March 1, 2021, that Plaintiff's overall physical examination was normal except for right knee pain at 6/10 and related symptoms due to a fall); Tr. 3499-3501 (noting, on March 29, 2021, that Plaintiff's overall physical examination was normal when he presented for pre-op clearance for right knee surgery and reported 6/10 pain and related

34

symptoms in his right knee); Tr. 3495-97 (noting, on April 2, 2021, that

Plaintiff sought referral for hernia repair, but his examination was otherwise

unremarkable); *cf*. Tr. 347 (noting that Plaintiff's physical examination by

Dr. Long on November 6, 2018 was normal except for a guarded lumbar

range of motion and stiffness with changing position); Tr. 3157 (noting, on

May 20, 2019, that Plaintiff's examination of the back and extremities was

mostly unremarkable except for a positive straight leg raising test on the left

in a seated position).) [13]

Finally, the ALJ properly considered Plaintiff's attempts to find work

after his alleged onset date and his reported daily activities in discrediting

Plaintiff's subjective complaints.  (*See* Tr. 42 (noting that Plaintiff was able to

wash dishes, fold clothes, prepare simple meals, shop for groceries

independently, drive, walk outside for twenty minutes a day, do light yard

---

[13] Dr. Sharma's examination notes showed more abnormal findings.  For example, on December 11, 2018, January 25, 2019, April 23, 2019, and October 2, 2019, Plaintiff walked with antalgic gait, had moderate tenderness on palpation in the lumbar spine, moderate limitation in the range of motion, and a positive facet loading test on both sides.  (Tr. 364-65, 383, 3208, 3212.)  On May 11, 2020, during a telehealth visit with Dr. Sharma's office, Plaintiff reported a pain level of 6/10 and exhibited antalgic gait, moderate limitation in the range of motion, a positive straight leg raising test, and a positive facet loading test on both sides.  (Tr. 3292-93.)  On January 7, 2021, Plaintiff again exhibited antalgic and slow gait, moderate tenderness on palpation in the lumbar spine and in the left sacroiliac ligament, moderate limitation in the range of motion, a positive Fortin Finger Test, a positive Patrick's Test, and a positive Compression Test.  (Tr. 3486-88.)  However, these and any other positive examination findings do not undermine the substantial evidence in the record supporting the ALJ's conclusions.

work, spend time at the beach, and use electronic devices); Tr. 57-58
(testifying at the May 13, 2021 hearing that Plaintiff last looked for work at
"the end of 2018 or 2019"); Tr. 59-63 & 66 (stating at the May 13, 2021
hearing that Plaintiff was able to do the dishes and the laundry, fold clothes,
prepare simple meals, take out the trash, use electronic devices, drive, walk
outside as much as possible, and shop for groceries independently, but denied
doing any yard work); *cf.* Tr. 63-64 (reporting difficulties with gripping and
grasping objects).)  To the extent Plaintiff argues that the ALJ should have
assessed greater limitations in light of his reported daily activities, subjective
complaints alone are insufficient to establish work-related limitation or
disability.  *See* 42 U.S.C. § 423(d)(5)(A) ("An individual's statement as to pain
or other symptoms shall not alone be conclusive evidence of disability . . . .").
Here, the ALJ's RFC assessment accounted for Plaintiff's impairments and
any resulting limitations to the extent they were supported by credible
evidence.

In sum, the ALJ properly considered Plaintiff's subjective complaints
and his assessment was supported by substantial evidence.  The ALJ's
evaluation of the medical opinions and prior administrative medical findings
was also based on correct legal standards and was supported by substantial
evidence.

## III.   Conclusion

The Court does not make independent factual determinations, re-weigh the evidence, or substitute its decision for that of the ALJ.  Thus, the question is not whether the Court would have arrived at the same decision on *de novo* review; rather, the Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence.  Based on this standard of review, the ALJ's decision that Plaintiff was not disabled within the meaning of the Social Security Act for the time period in question should be affirmed.

Accordingly, it is respectfully **RECOMMENDED** that:

1.     The Commissioner's decision be **AFFIRMED**.

2.     The Clerk of Court be directed to enter judgment accordingly, terminate any pending motions, and close the file.

**DONE AND ENTERED** at Jacksonville, Florida, on June 30, 2022.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

The Hon. Marcia Morales Howard
United States District Judge

Counsel of Record

37